*AO 91 (Rev. 11/11) Criminal Complaint*

FILED

NOV 22 2019

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Ashley A. Chung (312) 697-4089

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MAURICE MURPHY

CASE NUMBER:

19 CR 888

MAGISTRATE JUDGE COLE

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about November 19, 2019, at Des Plaines, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 2113(a) and 2 | by force and violence, and by intimidation, took from the person and presence of a bank employee approximately $15,536 in United States currency belonging to, and in the care, custody, control, management, and possession of a bank, namely, the Bank of America located at 1300 East Oakton Street, Des Plaines, Illinois, the deposits of which were then insured by the Federal Deposit Insurance Corporation |

This criminal complaint is based upon these facts:

 X  Continued on the attached sheet.

HERBERT E. HOGBERG III
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: November 21, 2019

City and state: Chicago, Illinois

*Judge's signature*

JEFFREY COLE, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, HERBERT E. HOGBERG III, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since July 2002.  My current responsibilities include the investigation of violent crimes, including, among others, kidnaping, bank robbery, and the apprehension of violent fugitives.

2.     This affidavit is submitted in support of a criminal complaint alleging that MAURICE MURPHY has violated Title 18, United States Code, Section 2113(a). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging MURPHY with bank robbery, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, information that appears in law enforcement records, interviews of witnesses, my review of surveillance video and images, my training and experience, and the training and experience of other law enforcement agents.

## I.   FACTS SUPPORTING PROBABLE CAUSE

4.   In summary, and as described further below, based on surveillance video and images, witness interviews, and law enforcement's investigation, there is probable cause to believe that on November 19, 2019, MAURICE MURPHY aided and abetted the robbery of the Bank of America located at 1300 East Oakton Street, Des Plaines, Illinois, by acting as a getaway driver.

### November 19, 2019 Robbery of Bank of America

5.   According to information provided by bank employees and other witnesses, and surveillance video provided by Bank of America, which I have reviewed, on November 19, 2019, at approximately 4:31 p.m., a male individual ("Robber 1") robbed the Bank of America located at 1300 East Oakton Street, Des Plaines, Illinois.

6.   More specifically, according to a Bank of America teller who was working at the bank on November 19, 2019 ("Teller A"), Teller A observed a male individual (Robber 1) entering the bank through the north side doors. Teller A went to greet Robber 1, but then observed that Robber 1's face was completely covered in black material and that Robber 1 was carrying a gun pointed at Teller A. Teller A became fearful for his/her safety and for the safety of others at the bank. Upon reaching Teller A, Robber 1 said something to the effect of, "Shut up, go back here, give me the money," while gesturing for Teller A to take Robber 1 behind the teller stations. Teller A twice entered an access code to open the two doors leading behind

2

the teller stations. During this time, Robber 1 was behind Teller A with the gun pressed into Teller A's back.

7.    Also according to Teller A, once Teller A and Robber 1 were behind the teller stations, Robber 1 gestured toward a teller station, said something to the effect of, "Go over there, unlock it, give me the money," and handed Teller A a white plastic bag from Robber 1's pocket. Teller A and another Bank of America teller ("Teller B") began removing cash from the top drawer and placing it inside the bag, and Robber 1 indicated that he also wanted cash from the second drawer. While Teller A and Teller B removed cash from the second drawer, Teller A placed a GPS tracking device inside the bag. Robber 1 then grabbed the bag from Teller A, said something to the effect of, "Thanks," and exited the bank through the north side doors.

8.    Also according to Teller A, another Bank of America employee ("Employee A") then went to lock the north side doors. Teller A heard Employee A say that Robber 1 was getting into a black vehicle with a temporary Illinois license plate,[1] that the vehicle was heading west through the parking lot, and that it then was going north on Lee Street.[2]

---

[1] Based on my training and experience, I know that Illinois Temporary Registration Permits are issued to new purchasers of vehicles who have filed vehicle registration applications but have not yet received new license plates. I also know that Temporary Registration Permits typically resemble cardboard license plates with a yellow background.

[2] Based on law enforcement review of a map of the area of the bank, I understand that Lee Street and Mannheim Road are the same street, and that near the bank, Lee Street changes its name to Mannheim Road. Based on law enforcement training and experience, law enforcement understood Teller A's description of Employee A's observations to be referencing Mannheim Road.

9.    Teller A described Robber 1 as a six-feet tall male of medium build wearing a black "hoodie"-style shirt with the hood up, a black face covering, "kitchen"-style rubber gloves, jeans, and boots. Teller A described Robber 1's gun as a small black handgun.

10.    According to Employee A, Employee A was seated near the center of the bank facing the teller line and speaking with a customer when he/she noticed Robber 1 walk through the north doors of the bank. Robber 1 approached Teller A, pointed the gun at Teller A's back, and used the gun to push Teller A as they walked toward the doors leading behind the teller stations. Employee A heard the beeping of the access code being entered into each door's lock and the buzzing of each door unlocking. Employee A saw Robber 1 walk Teller A to Teller B's station and heard Robber 1 tell Teller A and Teller B to give Robber 1 all the money from the top and bottom drawers. Robber 1 then twice said something to the effect of, "Everybody look down, don't move." According to Employee A, Robber 1 spoke loudly in a mean, assertive tone, and Employee A felt scared and became concerned that Robber 1 might begin shooting in order to make people comply with his demands. Employee A noticed the customer with whom Employee A had been speaking turn to look toward Robber 1, and Employee A told the customer in Spanish not to look at Robber 1. Robber 1 then exited from behind the teller stations, left the bank through the north side doors while cradling the bag of money, and headed toward the parking lot of a restaurant located directly north of and adjacent to the bank ("Restaurant A").

11.     Also according to Employee A, Employee A then went to lock the north side doors of the bank and observed Robber 1 entering the rear driver's side door of a vehicle. Employee A described the vehicle as a dark blue Kia Optima with tinted windows and a yellow Illinois temporary license tag. The vehicle then exited Restaurant A's parking lot and headed northbound on Lee Street.[3]

12.     Employee A described Robber 1 as being slim built and between approximately six feet and six feet and two inches in height, and appearing taller than Teller A (who is approximately five feet nine inches tall). Employee A further described Robber 1 as sounding African American, and wearing a black ski mask with no holes, a baseball-style hat, a white sweater, and dark blue jeans, and carrying a white grocery bag in his left hand and a black gun in his right hand.

13.     According to a witness in the parking lot of Restaurant A at the time of the robbery ("Witness A"), Witness A saw a male individual running awkwardly out of the Bank of America toward a vehicle parked on the south side of Restaurant A's parking lot, the side closest to the bank. Witness A described the male individual as wearing a black face mask and gloves and being hunched over clutching something against his chest while sprinting. Witness A looked toward the bank and observed numerous people inside the bank window pointing toward the male individual.

---

[3] Based on law enforcement training and experience, and law enforcement's review of a map of the area of the bank, law enforcement understood Employee A to be referencing Mannheim Road, which turns into Lee Street.

Witness A then observed the male individual enter a vehicle in Restaurant A's parking lot that pulled out of its parking spot and exited onto Lee Street.[4]

14. Witness A described the vehicle as a newer model, dark blue Kia Optima with tinted windows and an Illinois temporary license plate starting with the numbers "93." According to Witness A, Witness A previously owned a Kia Optima, and so he/she is certain of the make of the vehicle.

15. According to my review of the bank's surveillance video, Robber 1 appears to be a male individual, approximately six feet tall and weighing approximately 180 to 200 pounds, wearing a black long-sleeved hooded shirt with the hood up, a white short-sleeved t-shirt over the long-sleeve hooded shirt, a dark-billed baseball cap, black pants, black shoes, yellow gloves, and a black covering over his face.

16. A post-robbery audit conducted by Bank of America showed that approximately $15,536 was taken during the robbery.

17. According to records maintained by the Federal Deposit Insurance Corporation (FDIC) and information provided by bank employees, at the time of the robbery, the bank's deposits were insured by the FDIC.

### Bank Exterior Surveillance Video

18. According to my review of the bank's exterior surveillance video, at approximately 4:28 p.m., three minutes before the robbery, a dark blue four-door

---

[4] Based on law enforcement training and experience, and law enforcement's review of a map of the area of the bank, law enforcement understood Witness A to be referencing Mannheim Road, which turns into Lee Street.

sedan backed into a diagonal parking spot on the side of Restaurant A's parking lot closest to the bank, and then pulled forward to reposition. The vehicle's brake lights then turned off. Because the vehicle backed into a diagonal spot, it was angled against the normal flow of traffic in the parking lot.

19.     According to the same video, less than a minute later, I observed the following unusual activity in the sedan: the driver's side rear window opened a few inches and then closed; the driver's side rear door twice opened a several inches and then closed; the driver's side rear door opened 12 to 18 inches and then closed again; and the driver's side window again opened several inches, lowered a few more inches, and then closed.

20.     According to the same video, at approximately 4:31 p.m. (which was the approximate time of the bank robbery), the driver's side rear door opened and an individual wearing a black long-sleeved hooded shirt, a white short-sleeved t-shirt on top of the long-sleeved shirt, a black covering over his face, and yellow gloves exited the vehicle through the driver's side rear door. Seconds later, the vehicle's brake lights illuminated and remained on. Based on my comparison of the exterior bank surveillance video with surveillance images from inside the bank, the masked individual exiting the vehicle appears similar in height, build, and clothing to Robber 1. According to the video, the masked individual then walked through the bushes between Restaurant A's parking lot and the bank, toward the north side doors of the bank, and pulled a gun from his front pants pocket. The masked individual then entered the bank. Approximately seven seconds later, the dark sedan slowly

rolled forward (approximately 18 to 24 inches) in its parking space, and then stopped with its brake lights still on.

21.    According to the surveillance video, approximately one minute later at 4:32 p.m., the same masked individual exited the bank wearing the black covering over his face and yellow gloves, ran to the rear driver's side door of the dark sedan, and entered the vehicle. As the driver's side rear door closed, the vehicle drove forward out of the diagonal parking spot, against the flow of traffic and out of the camera's field of view.

### Initial Location Monitoring of GPS Tracking Device

22.    After the bank robbery, law enforcement received notification that the GPS tracking device placed into Robber 1's bag by Teller A had moved. Shortly thereafter, using the tracking software issued by the third-party vendor that provides the GPS service to the bank, law enforcement officers monitored the signals emitted by the GPS device and tracked its location following the robbery. Based on law enforcement's tracking of the GPS device, the device first headed north on Lee Street and then made a U-turn to head south on Lee Street, consistent with Employee A's and Witness A's respective observations of the dark blue Kia Optima. The device then traveled approximately two to three blocks south and east of the bank and came to a stop in a north-south alley between Ash Street and Pine Street, located south of Prospect Avenue and North of Howard Avenue.

## Identification of Subject Vehicle

23.     Law enforcement officers searched the area around the end location of the GPS tracking device and located a dark blue Kia Optima (the "Subject Vehicle") parked in a rear alley between Ash Street and Pine Street. The Subject Vehicle had an Indiana license plate affixed by only one screw. While continuing to search the nearby area, law enforcement found a yellow Illinois temporary registration permit starting with the numbers "93" in a garbage can located approximately six to seven feet from the Subject Vehicle.

24.     According to my review of various surveillance videos from the area of the Subject Vehicle, two males were at or near the parked Subject Vehicle following the bank robbery.

25.     According to my review of surveillance video from a motion-activated camera located just south of the Subject Vehicle and facing northwest, as of approximately 4:39 p.m. (eight minutes after the robbery), the Subject Vehicle was already parked at the location where it was later found by law enforcement. In the video, an individual walked from off-camera (from the east side of the alley) toward the driver's side of the Subject Vehicle. The recording then stopped.[5] Approximately 39 seconds later, the recording restarted and shows another individual with a dark shoulder bag moving east from the rear driver's side corner of the Subject Vehicle down a driveway in the direction of 19xx Pine Street.

---

[5] Based on my training and experience, and my review of this surveillance video, I believe that the video recording stopped because the camera sensor no longer detected motion.

26.     According to my review of additional surveillance video located at 19xx Pine Street and facing west toward the alley in which the Subject Vehicle was parked, approximately six to seven minutes after the bank robbery, a dark sedan can be seen driving into view and then parking out of view in the area of the Subject Vehicle. Approximately one minute later, a pair of feet are seen walking from the direction of the Subject Vehicle toward a garbage can at the top of the screen. Based on law enforcement's comparison of the surveillance video to the physical scene, law enforcement determined that this is the same garbage can where the yellow Illinois temporary registration permit starting with the numbers "93" was recovered. According to the video, the individual at the garbage then put on a light-colored jacket with dark trim on the cuffs and bottom edge, and moved back in the direction of the Subject Vehicle and out of view. Approximately one minute later, the individual in the light-colored jacket again walked toward the area of the garbage can and was joined by a second individual also coming from the direction of the Subject Vehicle. The individual in the light-colored jacket was carrying a drink can; and the second individual was wearing a white short-sleeved t-shirt and dark puffy jacket and carrying a dark shoulder bag. Both individuals walked quickly east, away from the direction of the alley, while looking around in all directions, and were out of view at approximately 4:40 p.m.

27.     According to my review of surveillance video from another camera at 19xx Pine Street, facing east toward Pine Street, at approximately 4:41 p.m., two individuals walked into view heading east. Based on comparison to the other

surveillance videos described above, I determined that the two individuals' respective heights, builds, clothing, and accessories (including one individual wearing a light-colored jacket with dark trim on the cuffs and bottom edge, and a taller individual wearing a white short-sleeved t-shirt and black puffy jacket, and holding a dark shoulder bag) appeared consistent with the two individuals seen walking from the direction of the Subject Vehicle in the other 19xx Pine Street recording. The individual in the light-colored jacket was also wearing charcoal-colored pants, and the taller individual with the dark shoulder bag was also wearing white and black shoes and dark blue jeans. According to the video, approximately 15 seconds later, both individuals ran in different directions, with the taller individual holding the dark shoulder bag running off-camera into a yard located across the street from 19xx Pine Street, and the individual in the light-colored jacket heading north and dropping his drink can by a tree. A few seconds later, a marked police car drove by.

28.     In a subsequent search by law enforcement of the yard located across the street from 19xx Pine Street, law enforcement found a black face covering, a black long-sleeved hooded shirt, black pants, and black shoes hidden in a flowerbox. Based on a comparison to bank surveillance video of the robbery, law enforcement determined that items appear consistent with those worn by Robber 1 during the bank robbery.

29.     Based on law enforcement review of this surveillance video, in which the two individuals' facial features and physical attributes are visible, and later comparison to driver's license images and information for "MAURICE MURPHY" and

11

"CHRISTOPHER WILLIS" in a law enforcement database, law enforcement identified the individual in the light-colored jacket who dropped the drink can as MAURICE MURPHY, and the taller individual with the dark shoulder bag as CHRISTOPHER WILLIS. Law enforcement also later retrieved the drink can dropped by MURPHY.

### Arrest and Identification of MAURICE MURPHY

30. While searching the area indicated by the GPS tracking device, law enforcement observed several civilians chasing a male individual running in the area.

31. According to a witness in the area ("Witness B"), Witness B was at 19xx South Chestnut Street with friends when they observed a black male running across an alley at the rear of the address. According to my review of the physical scene and a map of the area, 19xx South Chestnut Street is located approximately one block east of 19xx Pine Street. According to Witness B, Witness B heard law enforcement sirens and saw emergency lights in the area and suspected that the running individual was possibly connected to the law enforcement presence in the area. Witness B observed the individual first running northeast and then doubling back and running southbound through the backyards of residences on the west side of Chestnut Street. When the individual reached the backyard of 19xx South Chestnut Street, Witness B and his/her friends chased and tackled the individual. At approximately 4:45 p.m., law enforcement officers in the area took the individual into custody.

32.     Law enforcement later determined this individual to be MAURICE MURPHY. MURPHY is a 32-year old black male with brown eyes and black hair. Law enforcement found MURPHY's Illinois driver's license on MURPHY's person at the time he was taken into custody, and determined that MURPHY matched the license photograph and physical identifiers on the license. MURPHY also later identified himself as "MAURICE MURPHY" to law enforcement officers.

33.     At the time he was taken into custody, MURPHY was wearing, among other things, a light-colored jacket with dark trim on the cuffs and bottom edge and charcoal-colored pants, consistent with that worn by the individual recorded near the Subject Vehicle, at the garbage can where the Illinois temporary tag was later found, and later throwing away a drink can while running through the area. MURPHY had on his person his wallet, which contained, among other things, (i) approximately $676 of cash, including a number of apparently counterfeit bills, (ii) a receipt, time-stamped for 3:27 p.m. that day, from a store in Bellwood, Illinois ("Store A") for the purchase of an energy drink, and (iii) the employee ID card, Indiana driver's license, and debit card of a female individual ("Individual A"), later determined by law enforcement to be the owner of the Subject Vehicle (as discussed in greater detail below).

## Pursuit of Robber 1

34.     Upon arriving in the area of the GPS tracking device's location after the bank robbery, law enforcement set up a perimeter around the area and began searching for Robber 1.

35.     At approximately 6:45 p.m., a resident in the area ("Resident A") alerted law enforcement officers that he/she had just been held at gunpoint by a black male individual who demanded Resident A's car keys and fled the area in Resident A's vehicle, described as a Buick sedan.

36.     Other law enforcement officers in the area observed a Buick sedan in the area and began pursuit. Law enforcement followed the Buick as it entered the Interstate 90 eastbound at a high rate of speed, exited Interstate 90, and crashed in the area of 45xx Irving Park Road in Chicago, Illinois. The driver then exited the Buick, and a shootout ensued, during which a law enforcement officer, a civilian, and the driver of the Buick were shot. The driver of the Buick died at the scene.

### Identification of CHRISTOPHER WILLIS

37.     Following the shootout, law enforcement observed that the driver of the Buick was wearing a white short-sleeved t-shirt, a black puffy jacket, dark blue jeans, and white and black shoes. Based on comparison to the surveillance videos from the vicinity of the Subject Vehicle, law enforcement determined that the driver's clothing appeared consistent with that of the taller individual with the dark shoulder bag recorded on the videos. Law enforcement also recovered from the driver's person a Springfield XD-S 9mm pistol bearing serial number HG900482. Based on a comparison to the bank surveillance video, the pistol appears consistent with the handgun used by Robber 1 in the bank robbery.

38.     According to a search of the driver's fingerprints in a law enforcement database, the driver's fingerprints matched those of CHRISTOPHER WILLIS. Law

enforcement also determined that the driver's physical appearance matched an Illinois driver's license photograph and physical identifiers for "CHRISTOPHER WILLIS" in a law enforcement database.

39.     Law enforcement also located and recovered from the Buick a black shoulder bag containing approximately $15,396 in cash and a GPS tracking device. The tracking software issued by the GPS service vendor showed that the tracking device had left the area of the Subject Vehicle and then came to a stop at Irving Park Road, consistent with the location of the Buick. The start and end locations of the GPS tracking device are consistent with the start and end locations of the Buick observed by law enforcement in pursuit.

### Interview of Individual A and Search of the Subject Vehicle

40.     According to a law enforcement search of the Indiana license plate on the Subject Vehicle, the Subject Vehicle is owned by Individual A.

41.     Law enforcement contacted Individual A and interviewed her in person. According to Individual A, he/she had met with CHRISTOPHER WILLIS earlier in the day and had loaned WILLIS her car.  Individual A said that he/she had told WILLIS that he needed to return with her vehicle by 2:00 p.m., but that WILLIS had not done so and had not answered Individual A's phone calls later that day.

42.     Law enforcement obtained Individual A's consent to search his/her vehicle. Law enforcement found that the only seats inside the vehicle that were clear of papers, trash, and other items were the driver's seat and the rear driver's seat. In connection with the consent search, Individual A asked law enforcement to search for

his/her employee ID card and debit card, which he/she said should be on or near the driver's seat of the car, or in the console next to the driver's seat. Law enforcement did not find these items inside the vehicle. However, as discussed above, these items were found on MURPHY's person when he was taken into custody.

### Surveillance Video from Store A

43. According to law enforcement review of surveillance video from inside Store A prior to the bank robbery, and based on a comparison of that video to driver's license images for WILLIS and MURPHY and law enforcement's in-person interactions with WILLIS and MURPHY on the day of the bank robbery, law enforcement determined that approximately one hour before the bank robbery, WILLIS and MURPHY were together inside Store A. WILLIS is seen on the video wearing a white short-sleeved t-shirt, dark puffy jacket, dark blue jeans, and white and black shoes, appearing consistent with what he was found wearing after the shootout. According to the video, at approximately 3:26 p.m., WILLIS purchased an item that appears to be packaged gloves. According to an employee of Store A and Store A's records, the purchase at this time was for yellow kitchen gloves. Based on law enforcement's review of a photograph of the purchased gloves and a comparison to the bank surveillance video, the gloves purchased by WILLIS appear consistent with those worn by Robber 1 during the bank robbery. Additionally, according to the video, approximately one minute later, MURPHY purchased a canned energy drink, whose color, design, and size appears consistent with the can dropped by MURPHY after the bank robbery and later retrieved by law enforcement. In the video,

MURPHY is wearing a dark hooded sweatshirt and charcoal-colored pants, and his pants appear consistent with those he was wearing after the bank robbery when he was taken into custody.

44.     According to law enforcement review of earlier surveillance video from the exterior of Store A, MURPHY can be seen arriving at Store A in a dark four-door sedan appearing consistent with the Subject Vehicle, and WILLIS can be seen arriving at Store A in a Ford F-150 pickup truck. After exiting from Store A, MURPHY and WILLIS then departed in the same respective vehicles. Law enforcement later returned to the area where the Subject Vehicle was found and located a Ford F-150 pickup truck approximately two blocks north of where the Subject Vehicle was parked. According to a search of the pickup truck's license plate in a law enforcement database, the truck was a rental vehicle that had been reported stolen. During an inventory search of the stolen truck, law enforcement found inside a rental receipt listing "CHRISTOPHER WILLIS" as the renter of the vehicle and a wallet containing items identified as belonging to "CHRISTOPHER WILLIS."

### Interviews of MAURICE MURPHY

45.     During his first *Mirandized* interview on or about November 19, 2019, MAURICE MURPHY stated, in sum and substance, that he had not been involved in the bank robbery and had not been in or near the Kia Optima. MURPHY said that earlier in the day, he had taken the CTA Red Line train from the south side of Chicago to Evanston, Illinois. MURPHY said a female had then ordered him an Uber to pick him up in Evanston and drop him off at her address; the Uber dropped him off at the

designated drop-off address, but the female who had ordered the Uber did not live there. MURPHY further said that he was running at the time of his apprehension because he had been smoking cannabis, was from the south side of Chicago, and had learned to run from police.

46.     During his second *Mirandized* interview, on or about November 20, 2019, MURPHY first repeated, in sum and substance, the statements he made during his prior interview on November 19, 2019, and denied knowing "Chris." Law enforcement officers later showed MURPHY still surveillance images of MURPHY and WILLIS together inside Store A before the bank robbery and of MURPHY and WILLIS together in the area of the Subject Vehicle after the bank robbery. MURPHY then said, in sum and substance, "you got me" and that he did "it" because he needed the money. MURPHY also said, in sum and substance, that "it" was not his idea, that "Chris" had needed a driver, that this was the only time that he had done "it" with "Chris," and that the officers should examine the difference between MURPHY's and "Chris's" "backgrounds." Based on the law enforcement officers' training and experience, and the nature of the discussion, the officers understood "backgrounds" to refer to MURPHY's and WILLIS's criminal histories.   MURPHY further said, in sum and substance, that he did not know what his "cut" was going to be, as he did not know how much money "Chris" was going to get, but that MURPHY needed some money. MURPHY then asked for a lawyer.

## Conclusion

47.     Based on the above information, I respectfully submit that there is probable cause to believe that, on or about November 19, 2019, MAURICE MURPHY, took, by force and violence, and by intimidation, from the person and presence of bank employees approximately $15,536 in United States currency belonging to and in the care, custody, control, management, and possession of a bank, namely, the Bank of America located at 1300 East Oakton Street, Des Plaines, Illinois, the deposits of which were then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Section 2113(a).

FURTHER AFFIANT SAYETH NOT.

HERBERT E. HOGBERG III
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on November 21, 2019.

JEFFREY COLE
United States Magistrate Judge